# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　vs.<br><br>CORNELL WILLIAMS,<br><br>　　　　　　Defendant. | 8:20CR315<br><br>FINDINGS AND RECOMMENDATION |

　　　　This matter is before the Court on the Motion to Suppress Evidence (Filing No. 21) filed by Defendant, Cornell Williams. Defendant filed a brief (Filing No. 22) in support of the motion and the government filed a brief (Filing No. 24) in opposition. Defendant was given leave to file a reply brief (Filing No. 29).

　　　　The Court held an evidentiary hearing on the motion on July 1, 2021. Defendant was present with his attorney, Richard McWilliams. The government was represented by Assistant United States Attorney, Jody Mullis. Omaha Police Department ("OPD") Sergeant Candace Phillips ("Sgt. Phillips") and OPD Officer Zachary Petrick ("Officer Petrick") testified on behalf of the government. Exhibit Nos. 1-15 were offered by the government. The Court received Exhibits 2-15 without objection and sustained Defendant's objection to Exhibit No. 1. A transcript (TR.) of the hearing was prepared and filed on August 1, 2021. (Filing No. 53). The matter is now fully submitted to the Court. Because the government has not met its burden to establish exigent circumstances justified the warrantless entry of Defendant's residence, the undersigned magistrate judge will recommend Defendant's motion seeking suppression of evidence and statements obtained from the warrantless entry be granted, except as to Defendant's recorded statements made to his girlfriend while awaiting transportation to the Douglas County Correctional Center.

## BACKGROUND

　　　　While on duty at 9:35 p.m. on September 4, 2020, Sgt. Phillips was called to an apartment complex because an individual "had fired a shot off their balcony."[1] (TR. 17). Sgt. Phillips was

---

[1] The audio of the initial 911 call was received into evidence as Exhibit 2. The caller stated she was calling on behalf of her neighbor that saw and heard her downstairs neighbor shoot a gun. The caller provided information

advised the suspected shooter was a black male in a wheelchair by the name of Cornell (Defendant). (TR. 19). Sgt. Phillips' body worn camera began recording after she received the call. (Ex. 4). Officer Arenas (Ex. 5 - body camera footage) and Officer Partida (Ex. 6 - body camera footage) also responded to the call.

Sgt. Phillips was not near the apartment complex and had to "drive a decent amount" to get there. (TR. 18). Sgt. Phillips testified that the apartment complex is comprised of several different multi-level apartment complexes set up in a square with a courtyard in the middle. (TR. 18-19). Once Sgt. Phillips arrived at the apartment complex, she radioed dispatch to find out from the 911-caller which direction the suspect's balcony faced. (Ex. 4 at 5:27-30). Dispatch spoke to the caller and relayed to officers the information that the suspect was not on the courtyard side and the caller was outside in the courtyard waiting. Sgt. Phillips next asked dispatch to find out whether the caller had heard any more shots after the initial call. Dispatch again talked to the caller and relayed the information to officers that no further shots had been heard since the initial call when "a couple rounds were fired off." (Ex. 4 at 6:30-7:50; Ex. 5 at 10:03-10:12; Ex. 6 at 10:03-10:08).

Sgt. Phillips had difficulty locating the correct apartment when she first arrived, as she had inadvertently parked several apartment buildings away from her intended location. Sgt. Phillips' body camera footage shows she walked around the apartment complex for a few minutes and generally reflects the apartment complex was dark and quiet. Sgt. Phillips encountered one gentleman that had just arrived at the complex in his car and asked what was going on. The gentleman told Sgt. Phillips he had not heard any shots. (TR. 20-21; Ex. 4 at 8:15-11:52).

Meanwhile, officers Arenas and Partida had arrived at the apartment complex and located the 911-caller waiting outside the apartment complex. (TR. 23). The caller stated she had called them because her neighbors "on the other side" on the top floor were outside on their balcony when "the guy below them in the wheelchair went outside on the deck and shot a gun and scared them and their son pretty bad." (Ex. 5 at 14:45-15:06; Ex. 6 at 14:58-15:08). Sgt. Phillips joined up with officers Arenas and Partida as they were talking to the caller. (TR. 21-22; Ex. 4 at 12:35). The caller again stated the information from her neighbor that "the guy in the wheelchair, which

---

that a black male in his 20s-30s in a wheelchair was "shooting the gun" out on his balcony. The caller said no one got hit by the gunfire and believed the gun used was a handgun. (Ex. 2). Sgt. Phillips did not recall whether she received the information that no one was hurt. (TR. 52).

his name is Cornell, rolled out onto the deck" below her neighbors. The neighbors were upstairs "just hanging out" on their balcony when Cornell shot a gun from his balcony, which scared them and their son. That neighbor then came and got the caller and the caller called police. (Ex. 4 at 12:40-13:21; Ex. 5 at 15:06-40; Ex. 6 at 15:08-40). The caller stated apartment 32 is "the one with the gun." (Ex. 4 at 13:21-13:41). No one reported hearing a shot inside of the apartment and officers understood the shot had been fired outward from the balcony. (TR. 53).

The three officers proceeded down a short hallway to apartment 32. Officers Partida and Arenas immediately drew their firearms and began knocking on the apartment door. After a male inside the apartment said, "Hello?" the officers announced their presence. The officers' body camera footage reflects that the sound of a television loudly playing an NBA basketball game could be heard from inside the apartment, but otherwise no other sounds or voices could be heard. (TR 55-56; Ex. 4 at 14:07-40; Ex. 5 at 16:35-17:38). Sgt. Phillips briefly left the other two officers to head outside to look at apartment 32's deck from the outside. Sgt. Phillips saw nothing notable about the deck, which was unoccupied, and rejoined the other officers who were still outside the apartment door knocking. (TR. 24; Ex. 4 at 14:40-15:03).

Defendant, who is in a wheelchair, began unlocking and opening his apartment door. With a large rifle pointed at Defendant, Officer Partida ordered Defendant to show his hands and immediately entered the apartment. (Ex. 4 at 15:20-31; Ex. 5 at 17:38-47). Sgt. Phillips followed Officer Partida into the apartment and Officer Arenas entered shortly thereafter. The officers asked Defendant if he was the only one in the apartment and he replied he was the only person there. Sgt. Phillips patted down Defendant while the officers began asking Defendant if he had a gun in the apartment, whether he had been on his balcony, and whether he heard gunshots. The officers told Defendant someone said a gentleman in a wheelchair shot a gun off his balcony. (Ex. 5 at 17:47-19:00). Sgt. Phillips advised Defendant they would not search his apartment but wanted to look around to make sure no one else was there or hurt, and Defendant with his hands up stated, "You can do whatever you want." (*Id.* at 19:00-09). Officers Partida and Arenas performed a protective sweep of the apartment and did not locate anyone else. (*Id.* at 19:09-20:00).

The officers again told Defendant the reason they were at his apartment. Defendant stated he had just been watching the NBA game for "like two hours." Defendant began explaining he saw two people "near the trash cans" and heard the "guy upstairs" say he was going to call the police. (Ex. 4 at 17:45-18:25). After Defendant gestured to trash cans outside his apartment

3

balcony, Sgt. Phillips walked through Defendant's apartment to his balcony. Sgt. Phillips shined her flashlight onto Defendant's balcony and saw a handgun casing in the corner. (TR. 29-30). Sgt. Phillips' body camera reflects that Defendant's balcony faced a parking lot lined with trees. After seeing the casing, officers stated it was obvious there were shots fired and asked Defendant, "Where's the firearm?" (Ex. 4 at 18:25-19:18). Defendant repeatedly denied having a gun and denied knowing how the casing got on his balcony. Defendant also stated that he was on parole for failing to register. (*Id.* at 19:18-20:40).

Defendant denied consent to search for a firearm and, for some period of time, continued to deny he had a firearm or that he shot a gun. (*Id.* at 23:20-26:57). After it became apparent officers were going to start the process to obtain a search warrant, Defendant stated, unprompted, "Yep, I did fire the shot." (*Id.* at 26:57-27:00). Sgt. Phillips responded, "okay" and Defendant continued explaining what happened and admitted he fired one shot. (*Id.* at 27:00-28:24). Sgt. Phillips asked Defendant if he had the weapon on him and Defendant replied he did not; Sgt. Phillips began asking him where the weapon was "so nobody gets hurt." (*Id.* at 28:24-46). Sgt. Phillips continued to ask Defendant questions about where the weapon was located, and eventually Defendant stated it was in the kitchen cabinets. (*Id.* at 28:46-29:23). Sgt. Phillips asked if Defendant was a felon and he confirmed he was. Sgt. Phillips began searching through Defendant's kitchen cabinets, occasionally asking Defendant if she was looking in the right place or if the firearm was hidden, and after a few minutes located a firearm in a cabinet. (*Id.* at 29:23-31:01).

Sgt. Phillips stepped out of the apartment to make a phone call while Officer Partida provided Defendant with a *Miranda* advisement. Defendant stated he would not speak to Officer Partida. (Ex. 6 at 35:30-36:22). Sgt. Phillips reentered the apartment and asked Defendant whether his name was on the lease and whether it was his apartment. Defendant replied, "yes" and Officer Partida stated that Defendant had invoked his *Miranda* rights. (*Id.* 6 at 39:10-39:25). Defendant continued to talk about what had happened that evening. (*Id.* at 39:25-55:05). Defendant was placed in a transport van for booking at the correctional center and explained what happened to his girlfriend after she arrived.[2]

---

[2] Defendant's conversation with his girlfriend was captured by Officer Petrick's body camera footage received as Exhibit 12.

Defendant moves to suppress all physical evidence and statements obtained by law enforcement as a result of the warrantless entry and search of his residence on September 4, 2020. Defendant contends his Fourth Amendment rights were violated when officers entered his apartment without a warrant and conducted a subsequent search of his apartment without a warrant, consent, or exigent circumstances. Defendant seeks suppression of the firearm, shell casing, and any statements he made as a product of such Fourth Amendment violations. Defendant further seeks suppression of statements he made as violative of his Fifth and Sixth Amendments, asserting he was subjected to custodial interrogation without a *Miranda* rights advisement, and that all statements he made post-invocation of *Miranda* should be suppressed, including statements Defendant made to his girlfriend in the transportation van. (Filing No. 22 at p. 6; TR. 81).

The government asserts exigent circumstances justified both the warrantless entry into Defendant's apartment and the subsequent search, including the search of the kitchen cabinets where the firearm was found. (Filing No. 24 at pp. 12-15, 18-22). The government also asserts Defendant consented to a search when he stated, "you can do whatever you want." (Filing No. 24 at p. 17). The government further asserts the firearm would have been inevitably discovered. (Filing No. 24 at p. 23). Regarding Defendant's statements, the government contends all of Defendant's statements until the firearm was located are admissible under the public safety exception to *Miranda* and because Defendant was not in custody until the firearm was located. The government also argues Defendant's statement he "did fire the shot" was not in response to interrogation. The government further argues Defendant's statements to his girlfriend do not implicate *Miranda*. (Filing No. 24 at pp. 25-37). Finally, the government does not argue Defendant's statements made between 39:25 to 55:05 of Exhibit 6 are admissible under *Miranda*. (Filing No. 24 at p. 11 n.6).

## ANALYSIS

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. At the "very core" of the Fourth Amendment guarantee is "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Caniglia v. Strom*, ⸺ U.S. at ⸺, 141 S. Ct. 1596, 1599 (2021)(quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). "It is a basic principle of Fourth Amendment law that searches

and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)(quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)(internal quotation marks omitted)). Indeed, "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980)(quoting *United States v. U.S. Dist. Ct. of Mich., S.D.*, 407 U.S. 297, 313 (1972)(internal quotation marks omitted)). A warrantless entry into a home violates the Fourth Amendment if neither consent nor an exigency are present. See *Steagald v. United States*, 451 U.S. 204, 211 (1981). Therefore, all evidence resulting from an illegal entry into a home is inadmissible and must be suppressed. See *Wong Sun v. United States*, 371 U.S. 471, 484-87 (1963).

In this case, the government does not contend, nor would the record support, that Defendant consented to the entry into his apartment. Instead, the government solely relies on the exigent circumstances exception to the warrant requirement to justify law enforcement's warrantless entry into Defendant's apartment. (Filing No. 24 at p. 12-15). The exigent-circumstances exception to the warrant requirement "justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Ramirez*, 676 F.3d 755, 759 (8th Cir. 2012)(quoting *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996)). This exception "enables law enforcement officers to handle 'emergenc[ies]'— situations presenting a 'compelling need for official action and no time to secure a warrant.'" *Lange v. California*, ——U.S.——, 141 S. Ct. 2011, 2017 (2021)(quoting *Riley v. California*, 573 U.S. 373, 402 (2014)).

The government asserts the exigency of safety for themselves or others justified the warrantless entry into Defendant's property. (Filing No. 24 at p. 15). An "exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury" because "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Brigham City*, 547 U.S. at 403 (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury," *id.*, and must have an "objectively reasonable basis to believe that entry is necessary" to render such emergency assistance. *United States v. Sanders*, 4 F.4th 672, 677 (8th Cir. 2021)(quoting *Brigham City*, 547 U.S. at 403)). When examining whether officers had a reasonable basis to enter a home without a warrant, the court

6

"look[s] to the facts known to the officers at the time they made the decision to enter." *Id.* (citing *Burke v. Sullivan*, 677 F.3d 367, 371 (8th Cir. 2012). "[T]he exigent-circumstances exception is narrowly drawn," *United States v. Francis*, 327 F.3d 729, 735 (8th Cir. 2003)(citation omitted), and "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984).

Precedent establishes that, in order to enter a home without a warrant, the circumstances presented to officers must carry a serious sense of urgency to prevent imminent injury. In *Brigham City*, for example, when police officers responded to a 3:00 a.m. call for a loud house party, they immediately heard a "loud" and "tumultuous" altercation through the window of the house, heard "thumping and crashing," heard people yelling, "stop, stop," and then witnessed through a window an individual punch someone in the face, causing that person to spit blood into a sink. Under those circumstances, the Fourth Amendment did not require law enforcement "to wait until another blow rendered someone 'unconscious' or 'semi-conscious' or worse before entering." *Brigham City*, 547 U.S. at 406. In *Sanders*, the Eighth Circuit found officers' warrantless entry into a house was supported by exigent circumstances because they were responding to a domestic violence call, saw "a child in an upstairs window acting excitedly and gesturing" once they arrived, spoke outside the house to a woman that was "visibly upset and unstable" and was visibly injured consistent with a physical altercation, and heard crying coming from inside the home. Under those circumstances, the Eighth Circuit found the officers' warrantless entry into the home was permissible because "the officers reasonably believed that entry was necessary to either provide emergency assistance to the child who was heard crying or to prevent an imminent assault on the daughter who had reported the incident." *Sanders*, 4 F.4th at 677-78.

In this case, the government takes the position that the neighbor's report of seeing Defendant shoot a gun off of the balcony of his apartment was all that is required to establish the necessary exigent circumstances to enter Defendant's apartment without a warrant, citing to *Arizona v. Hicks*, 480 U.S. 321 (1987), three Eighth Circuit cases, and a handful of out-of-circuit cases. (Filing No. 24 at p. 14). Certainly, the undersigned magistrate judge does not discount the seriousness often attached to a situation involving reported gunfire. However, no case has established a bright-line rule that officers responding to a call for shots fired at a residence are *automatically* permitted to enter and search that residence without a warrant pursuant to the exigent-circumstances exception. As the Supreme Court recently reaffirmed, the exigent-

7

circumstances exception is examined on a "case-by-case basis" and requires the court to examine whether an emergency justified a warrantless entry and search in each particular case. *Lange,* —––U.S. at ––––, 141 S. Ct. at 2017 (recognizing this case-specific approach "reflects the nature of emergencies" and "depends upon facts on the ground"). Therefore, the court must examine the specific circumstances known to officers when responding to this particular call of gunfire to determine whether their warrantless entry into Defendant's apartment was objectively reasonable.

Here, officers were called to an apartment complex shortly after 9:30 p.m. because a black male in a wheelchair "had fired a shot off [his] balcony." (TR. 17). The 911-caller told the dispatcher no one was hit, although Sgt. Phillips testified she does not recall if that information was relayed to her. (TR. 52). Prior to arriving at the apartment complex, dispatch confirmed with the 911-caller that no other shots had been heard since the initial one that prompted the call, which information was also relayed to officers. When officers arrived at the apartment complex, their body camera footage reflects the complex was dark and quiet, and there did not appear to be any commotion or chaos that would suggest an emergency situation was ongoing. Officers made contact with the 911-caller, who spoke calmly to officers outside the apartment about what happened. The caller's demeanor did not suggest she was fearful or concerned with an ongoing emergency. She relayed essentially the same information to officers as she had relayed in her 911-call. The caller told officers "the guy in the wheelchair . . . rolled out onto the [balcony]" below her neighbors and shot a gun, which scared the neighbors. Sgt. Phillips testified that she understood the shot had been fired outward from the balcony and not inside. (TR. 53). Defendant's balcony did not face the courtyard side of the apartment complex and instead faced a largely empty parking lot lined by trees. Sgt. Phillips observed Defendant's apartment balcony from outside and saw that it was unoccupied. The only noise emanating from inside Defendant's apartment was a television loudly playing a basketball game and a male voice that said, "Hello?" in response to the officers' knocking. The officers' body camera footage does not reflect any other sounds were coming from inside the apartment such as gunshots, voices, shouting, music, footsteps, crying or signs of distress, or the like. So here, unlike *Brigham* or *Sanders*, officers did not observe anything to reasonably suggest someone was injured inside the apartment or that there was an active, ongoing altercation or violence requiring officers to immediately enter Defendant's apartment to render emergency assistance to a victim inside or to prevent imminent harm to others.

8

The government relies on the Supreme Court's decision in *Hicks* to support its position that a reported shooting establishes exigent circumstances supporting a warrantless entry of an apartment. However, in *Hicks*, the defendant conceded that exigent circumstances justified law enforcement's warrantless entry into his apartment because a bullet had been shot through his apartment floor and struck and injured a man in the apartment below. Under those circumstances, police were admittedly justified in entering the shooter's apartment "to search for the shooter, for other victims, and for weapons." *Hicks*, 480 U.S. at 323-24. Here, unlike *Hicks*, Defendant's neighbors reported they saw their neighbor in a wheelchair shoot a gun outward off his balcony, not inside his apartment, and that no one was hit. Defendant's balcony faced a largely empty parking lot and trees, not other apartment units. Officers were informed no further shots had been heard by the neighbors after the first 911 call was placed. So, although the officers could reasonably assume an individual in a wheelchair had a firearm in his apartment (as numerous Americans do),[3] officers had no information to reasonably suggest that someone *inside* Defendant's apartment was injured by gunfire requiring emergency assistance or that harm to others was imminent.

The Eighth Circuit cases cited by the government are also distinguishable from this case. In *United States v. Janis*, 387 F.3d 682, 687-88 (8th Cir. 2004), for example, the defendant shot himself in his leg in his home and was taken to a hospital. At the hospital, tribal officers spoke to the defendant's friend, who told officers the defendant shot himself "in [the friend's] room" and led the officers to the house and gestured for them to come inside. Officers observed a puddle of blood on the driveway and a trail of blood leading up the steps to the house. Under those circumstances, the Eighth Circuit found the tribal officers had consent to enter the house. Alternatively, the Eighth Circuit concluded officers were permitted to follow the trail of blood into the house to search for injured parties. *Janis*, 387 F.3d at 688. Unlike the instant case, the officers in *Janis* were presented with a trail of blood leading into the residence, providing concrete, objective evidence that someone could have been injured by gunfire and may need emergency assistance inside the residence.

In *United States v. Arcobasso*, 882 F.2d 1304, 1305 (8th Cir. 1989), the Eighth Circuit concluded a warrantless entry and search of the defendant's residence was supported by exigent

---

[3] It bears repeating that the record does not establish officers knew Defendant was a convicted felon at the time officers entered Defendant's apartment.

9

circumstances because officers were responding to a call for shots fired from within the residence and, upon arriving, "heard the clicking sound of a weapon being 'dry-fired'" and saw through an open window the defendant "sitting on a chair dry-firing a gun." Officers asked the defendant to exit the residence and asked him if anyone else was in the house to which the defendant supplied the name, "Rick." Unlike the instant case, the officers in *Arcobasso* were responding to shots fired inside a residence (not outside), officers personally observed an individual inside the residence dry-firing a gun, and were told by that individual there was someone else inside the residence—all of which the Eighth Circuit determined provided officers with an objectively reasonable belief that "Rick" might be injured inside the residence or pose a threat to officer safety. *Arcobasso*, 882 F.2d at 1306.

The most persuasive case cited by the government is *United States v. Valencia*, 499 F.3d 813, 816 (8th Cir. 2007), but still, the particular circumstances supporting the warrantless entry in that case are distinguishable from the circumstances of the instant case. In *Valencia*, in the early morning hours officers were informed that "several callers had reported that someone had fired multiple shotgun shells from an apartment building," that "shotgun pellets had fallen in a parking lot across the street," and identified the shooter as a Hispanic male and identified the apartment where the shots were coming from. *Valencia*, 499 F.3d at 814. When police arrived, they encountered the apparent tenant of the apartment on the street and he denied responsibility, while another part-time occupant "refused to shed any light on the situation." Some shotgun shells "were unaccounted for, no one had confessed to firing a weapon, and no weapon had been found;" thus, under the circumstances, officers were justified in entering the apartment without a warrant "to secure the shotgun and to discern if the shooter or any victims in need of medical attention remained inside." *Id.* at 816. The primary difference between *Valencia* and the instant case is that the single 911-caller in this case reported seeing an individual in a wheelchair shoot a gun outward off of his balcony and reported no one was hit. Officers did not have to discern whether the shot hit anyone inside, as the witnesses reported they heard no further shots after the first one. These circumstances do not suggest such urgency requiring officers to immediately enter Defendant's apartment without a warrant to secure a firearm to prevent imminent injury to others; rather, the officers could have requested consent for entry and search of Defendant's home or otherwise secured the premises and sought a warrant.

The undersigned magistrate judge finds that, based on the information known to officers at the time they made the warrantless entry into Defendant's apartment, there was not an objectively reasonable basis to believe such entry was required to render emergency assistance to an injured occupant or to protect others from imminent injury. The Fourth Amendment does not permit law enforcement, with guns drawn and without a warrant, to enter an individual's home based only upon the information that a neighbor saw the individual shoot a gun into the air off of his balcony. Considering that "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *Payton*, 445 U.S. at 585, and in considering "the exigent-circumstances exception is narrowly drawn," *Francis*, 327 F.3d at 735, the undersigned magistrate judge finds the government has not met its burden to establish exigent circumstances supported the warrantless entry into Defendant's apartment. Therefore, any evidence and statements obtained as a result of that warrantless entry must be suppressed as violative of Defendant's Fourth Amendment rights.[4] Upon consideration,

**IT IS HEREBY RECOMMENDED** to Chief United States District Court Chief Judge Robert F. Rossiter, Jr., that Defendant's Motion to Suppress Evidence (Filing No. 21) be granted, except as to Defendant's statements he voluntarily made to his girlfriend in the transportation van.

Dated this 31st day of August, 2021.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this

---

[4] However, the undersigned magistrate judge finds Defendant's voluntary statements he made to his girlfriend after his arrest are sufficiently attenuated from the illegal warrantless entry into his apartment. Defendant's statements were not the product of interrogation and he had previously been advised of his *Miranda* rights; Defendant simply had a conversation with his girlfriend that happened to be recorded. Accordingly, these statements do not require suppression. See *United States v. Riesselman*, 646 F.3d 1072, 1080 (8th Cir. 2011)(Voluntary statements that are sufficiently attenuated from the original taint need not be suppressed).

11

Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.