IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:20CR315 |
| v. | |
| CORNELL WILLIAMS, | MEMORANDUM AND ORDER |
| Defendant. | |

    This matter is before the Court on defendant Cornell Williams's ("Williams") Motion to Suppress Statements and Evidence (Filing No. 21). The Court referred Williams's motion to a magistrate judge, who held an evidentiary hearing on July 1, 2021, and issued a Findings and Recommendation (Filing No. 54) on August 31, 2021. *See* 28 U.S.C. § 636(b)(1)(B). The magistrate judge recommends granting Williams's motion in part and denying it in part, concluding the evidence and statements following the warrantless entry into Williams's apartment should be suppressed but statements made later to his girlfriend should not. The government and Williams both made timely objections (Filing Nos. 55 and 56). For the reasons stated below, the Court modifies in part and accepts in part the Findings and Recommendation, denying Williams's motion to suppress.

**I.    BACKGROUND**

    Around 9:35 p.m. on September 4, 2020, Omaha Police Department ("OPD") Sergeant Candace Phillips ("Sergeant Phillips") and OPD Officers Partida ("Officer Partida") and Arenas ("Officer Arenas," and collectively, "officers") were dispatched to 2327 Benson Gardens Boulevard in Omaha, Nebraska. The individual who called 911 ("Witness 1") stated that a black male in a wheelchair in Apartment 32 went out to his balcony with a handgun and was shooting it. Witness 1 explained to OPD dispatch that her neighbors were outside on their balcony, heard gunfire from below, got scared and

came over to her apartment, and she called 911. Witness 1 reported that no one had been hit or injured.

Once Sergeant Phillips arrived at the apartment complex, she called the dispatcher to ask where Witness 1 was waiting because she had some difficulty navigating the large apartment complex. Sergeant Phillips also asked the dispatcher to ask Witness 1 if any more shots had been fired since the initial call. The dispatcher notified Sergeant Phillips that Witness 1 was on the "courtyard side" and had not heard any additional gunfire since the initial call when "a couple rounds were fired off." On her way to meet Witness 1, Sergeant Phillips ran into an individual getting out of his car and asked him if he had heard any gunfire. He had not. Sergeant Phillips escorted him into the building and set off to find Witness 1.

When Sergeant Phillips arrived, Officers Partida and Arenas were outside of the apartment complex discussing the events with Witness 1. Witness 1 was explaining to the officers that her neighbors were outside on their balcony, which faced the parking lot, and "the guy below them in the wheelchair went outside on the deck and shot a gun and scared them and their son pretty bad." Witness 1 told the officers the man's name was Cornell, he was Black, was in a wheelchair, approximately thirty years old, and he lived in Apartment 32. As Witness 1 was showing the officers into the building, they briefly encountered the neighbor who originally saw and heard the shot, and she expressed how it frightened her and her family.

The officers walked down the hallway, arrived at the door of Apartment 32, drew their firearms, knocked on the door multiple times, and announced their presence. While Officers Partida and Arenas waited by the door, Sergeant Phillips briefly exited the building to view the balcony of Apartment 32. Seeing it was empty, she returned inside. Body-camera footage from Officer Partida reflects loud noise coming from the television inside the apartment and a man saying "Hello?" The officers again stated they were OPD and told him to open the door.

A man, who appeared to match the description provided by Witness 1 and later identified as Cornell Williams, opened the door. The officer closest to Williams—Officer Partida—immediately asked him to show his hands and put his hands up. The apartment was dark, and Officer Partida used a flashlight to see Willaims's hands and the surrounding area. Officer Partida stepped towards Williams to frisk him, then walked around Williams to check the back side of his wheelchair for any weapons. While Officer Partida continued the pat-down, Sergeant Phillips stood in the doorway, propping the door open, and asked Williams if he was the only one in the apartment, if he had heard the gunshot, and if he had been on the balcony. Williams stated he was alone, and appearing confused, stated he did not hear anything. He said he had been watching the basketball game on the television.

Williams retreated backwards into his dark apartment—away from the doorway and into the kitchen. Still talking to Williams as he was backing up, Sergeant Phillips took a few steps towards him and entered Apartment 32. She explained that they were responding to a 911 call from neighbors who heard gunshots and asked Williams if they could conduct a limited search to see if anyone else was in the apartment or injured. Williams agreed they could, stating "Yes, yes ma'am. You can do whatever you want." Officers Arenas and Partida conducted a sweep of Apartment 32 while Sergeant Phillips continued monitoring Williams. Williams also asked if Sergeant Phillips wanted to look at his phone, which she declined, telling him to relax and that they would be leaving soon.

While they were conducting the sweep, Sergeant Phillips again explained why they were there—that is, because a neighbor stated she saw a man in a wheelchair go onto the balcony of Apartment 32 and shoot a handgun. The officers confirmed no one else was in the apartment, and Williams then said he did see two people "near the trash cans" and "heard the guy upstairs" say he was going to call the police. Sergeant Phillips inquired about the people by the trash cans, and Williams gestured towards his balcony. She crossed the living room towards the sliding-glass door, asking if he meant the trash cans "out back,"

which he affirmed. Shining her flashlight out the door, Sergeant Phillips saw a shell casing on the balcony floor.

After seeing the casing, the officers again asked where the firearm was, noting it was obvious a shot was fired. Williams repeatedly denied having a gun and denied knowing how the casing ended up on his balcony. He also stated he was on parole for "failing to register." The officers asked for permission to search for the firearm, which Williams denied, inquiring if they had a warrant. Sergeant Phillips noted Williams did not consent to a search and told Officer Partida to "call regionals," advise them of situation, and ask who should begin the process of filling out the paperwork for a warrant. At the suppression hearing, Sergeant Phillips testified it was her full intention at that point to get a warrant to search for the gun. Officer Partida left to make the call to begin the warrant process.

After approximately forty seconds of silence, Williams blurted out, "Yep, I did fire the shot." Sergeant Phillips said, "Okay." Williams continued, admitting he fired one shot off his balcony. Sergeant Phillips asked if the gun was on him, and he said no. She asked where it was "for safety" purposes so "nobody gets hurt." Williams told her the gun was "behind him." Williams was still blocking the pathway from the living room to the kitchen, his back towards the kitchen. Sergeant Phillips asked him, "Can you roll forward then so we can grab it, sir?" He did, stating "Yes." Sergeant Phillips entered the kitchen, and after a series of questions and hints given by Williams as to the firearm's location, Sergeant Phillips found the firearm in a cabinet. The other officers entered the apartment amidst the question-and-answer period. After finding the gun, Sergeant Phillips left the apartment to make a phone call.

Officer Partida advised Williams of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). He invoked his right to remain silent. Sergeant Phillips reentered the apartment and asked Williams if his name was on the lease. Officer Partida told Sergeant Phillips that Williams had invoked his *Miranda* rights. The officers eventually placed

4

Williams in a transport van for booking at the detention center. While Williams was waiting in the transport van, his girlfriend arrived, and he told her what had happened. That conversation was recorded on another OPD officer's body camera.

The magistrate judge concluded there were no exigent circumstances to permit the officers' initial entry into Apartment 32 and recommended suppressing the firearm, shell casing, and Williams's statements made during the entry and subsequent search. The magistrate judge would admit the statements Williams made to his girlfriend while waiting for transportation.

## II. DISCUSSION

### A. Standard of Review

Upon a timely objection, § 636(b)(1) requires the Court to "make a de novo review of . . . specified proposed findings or recommendations to which objection is made." The Court can then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*; *accord* Fed. R. Crim. P. 59(b)(3).

### B. Exigent Circumstances for Entry and Sweep

The government specifically objects to the magistrate judge's "finding that officers' initial entry into Apartment 32 on September 4, 2020, was unlawful and that officers did not have exigent circumstances to enter Apartment 32." "When the government enters a defendant's home without a warrant, we presume that the search was unreasonable and therefore in violation of the Fourth Amendment." *United States v. Valencia*, 499 F.3d 813, 815 (8th Cir. 2007). But that presumption is rebuttable if the government can show sufficiently compelling exigent circumstances. *Id.* Exigent circumstances may justify a "warrantless entry or search if officers have [1] an 'objectively reasonable basis for believing . . . that a person within the house is in need of immediate aid,'" or (2) "an objectively reasonable belief of a threat to officer safety." *United States v. Quarterman*, 877 F.3d 794, 797 (8th Cir. 2017) (quoting *Michigan v. Fisher*, 558 U.S. 45, 47 (2009)). "The analysis of whether this exception to the warrant requirement has been made out is

an objective one focusing on what a reasonable, experienced police officer would believe." *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003).

Although "the presence of a weapon in a home does not necessarily constitute exigent circumstances," the Eighth Circuit "has consistently found exigent circumstances where officers reasonably believe a gun or an armed individual presents a danger to others or themselves." *Quarterman*, 877 F.3d at 797 (finding a warrantless entry was justified when the officers knew the defendant was making his girlfriend move out, had a gun, had been in an argument with the girlfriend's mother earlier that morning, and moved quickly when the door opened); *see also United States v. Janis*, 387 F.3d 682, 687 (8th Cir. 2004) (finding exigent circumstances justified the entry and search of home after a person shot himself with a gun and went to the hospital where he told police the gun was still at his house, and police saw blood outside the home when they arrived); *United States v. Vance*, 53 F.3d 220, 222 (8th Cir. 1995) (finding a warrantless entry and search justifiable on safety grounds when the officers had already arrested the suspect without incident but believed other persons and weapons were still in the home and posed a threat to officer safety); *Valencia*, 499 F.3d at 815 (finding a "clear justification" for a warrantless entry and search when officers knew a deadly weapon had been fired multiple times from an urban apartment thirty minutes earlier and "some pellets from one or more of those shells landed across the street").

When the officers knocked on Apartment 32's door, they had an objectively reasonable belief that the shooter was still inside Apartment 32, that he had possession of a gun, and he had fired that gun out into a residential parking lot approximately twenty minutes prior. The neighbors in the apartment complex were frightened by the gunfire. The officers heard a man inside and the television on loud, and the person who answered the door appeared to match the description of the shooter. At that point, a reasonable police officer could believe that the person who answered the door was armed and could be a danger to the officers and others who may be inside the apartment. *See United States v.*

*Roberts*, 824 F.3d 1145, 1147 (8th Cir. 2016) (finding the police acted reasonably when they were "framed in an open doorway to an apartment they thought might contain a gunman—potentially still armed and dangerous—facing someone who matched what they knew about the suspect" and entered the apartment, telling the suspect to put his hands up); *see also United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005) (explaining that when deciding "whether a warrantless entry was justified by exigent circumstances, we consider the circumstances that confronted police at the time of the entry"). Given what the officers knew at the time, Officer Partida acted reasonably when he asked Williams to put his hands up and quickly frisked him and his wheelchair for weapons, stepping inside Apartment 32 to do so. *See Quarterman*, 877 F.3d at 798 ("[T]he officers were objectively reasonable in believing that the gun presented a danger . . . Reasonable, experienced officers would not ignore the gun.").

The same exigent circumstances also justified the sweep of Apartment 32. As soon as Officer Partida completed the weapons frisk, Sergeant Phillips expressed concern for the safety of others that may be in Apartment 32. Williams denied he had a weapon, fired a gun, or that anyone else was in the apartment. Sergeant Phillips also asked Williams, upon those denials, if someone else shot the gun. *See Valencia*, 499 F.3d 813, 816 (8th Cir. 2007) (noting the suspect's denial of "having fired any weapons . . . generated a reasonable basis for officers to believe that the shooter may still be inside the apartment"). Although Witness 1 relayed no one had been injured, Sergeant Phillips testified at the hearing that on a report of gunfire, she needed to make sure no one in Apartment 32 was injured. *See id.* (finding "clear justification for a reasonable law-enforcement officer to enter the apartment without a warrant to secure the shotgun and to discern if the shooter or any victims in need of medical attention remained inside"). The totality of the circumstances support a finding that the officers had an objectively reasonable concern for their safety and the safety of any other potential occupants in the apartment to justify the protective sweep. *See Janis*, 387 F.3d at 687 (noting courts "have long held the 'view that legitimate concern for the safety of individuals may constitute 'exigent circumstances'

7

justifying warrantless entries and searches.'" (quoting *United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir. 1989))).

### C. The Shell Casing

Williams argues that even if there were exigent circumstances to conduct the protective sweep to ensure no injured parties were in Apartment 32, the exigency evaporated once Officers Partida and Arenas returned to the living room where Williams and Sergeant Phillips were talking, so the shell casing should be suppressed. Williams may be right that the exigent circumstances expired, but Williams downplays his ongoing conversation with Sergeant Phillips.

The government argues that even if exigent circumstances did not exist for Sergeant Phillips to examine the balcony, Williams consented to the search. Shortly after the officers entered Apartment 32 and explained they had received a call of reported gunfire, Sergeant Phillips asked Williams if they could search the apartment to make sure no one else was there or injured. He agreed, stating "Yes, yes ma'am. You can do whatever you want. I am on the only one here." *See Janis*, 387 F.3d at 686 (explaining voluntary consent to search by someone with authority over the premise is a valid exception to the warrant requirement). Williams argues that consent was not voluntary. In making that determination, courts consider:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] Miranda rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010).

Based on the circumstances here, the Court finds Williams voluntarily consented to the officers' initial search of his apartment, including Sergeant Phillips's examination of the balcony. Williams is an adult and stated he was on parole. Although the officers' guns were drawn initially when Williams opened the door, the officers quickly holstered or put aside their weapons. Sergeant Phillips was quick to ask for his consent to search, explaining that a neighbor had called 911 and made a report of gunfire from his apartment. The officers did not threaten Williams, nor was he detained in any way. Finally, Williams did not stand by silently upon the officers' request, he expressed unequivocal agreement. When Sergeant Phillips began walking towards the balcony, discussing the persons "by the trash cans," Williams did not revoke his consent—he affirmed they were out that direction. *See United States v. Lopez-Mendoza*, 601 F.3d 861, 868 (8th Cir. 2010) (explaining that the failure to object, "retract or narrow" consent to a search can be an indication the search is within the scope of consent). Sergeant Phillips had a lawful right to be in the living room where she looked onto the balcony and saw the shell casing. *See United States v. Spotted Elk*, 548 F.3d 641, 651 (8th Cir. 2008) ("Once lawfully inside the home, police may seize obviously incriminating items that are in plain view and that can be reached from somewhere the officer has a right to be."). The shell casing was in plain view and should not be suppressed.

### D. Williams's Incriminating Statements

Williams next argues he was subject to custodial interrogation without being advised of his *Miranda* rights, which ultimately led to his admission of firing the shot and statements regarding the location of the gun. As the government sees it, Williams was not in custody until they found the gun, and his statement that he did fire the shot was spontaneous. Williams also objects to the "magistrate judge's finding that his statement to his girlfriend from the back of Officer Petrick's vehicle should not be suppressed."

In *Miranda*, the Supreme Court held that a custodial interrogation must be preceded by warnings of an individual's right to remain silent, that any statement may be used against him, and that he has the right to counsel. *Miranda*, 384 U.S. at 478-79. "The rule under

*Miranda* prevents the government from using statements 'stemming from custodial interrogation of the defendant,' unless the government has used 'procedural safeguards effective to secure the privilege against self-incrimination.'" *United States v. Laurita*, 821 F.3d 1020, 1023 (8th Cir. 2016) (quoting *Miranda*, 384 U.S. at 444). But a person's Miranda rights are only triggered when they are being interrogated in police custody. *Id.* To determine whether a person is in custody for purposes of *Miranda*, courts consider "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation omitted). More specifically, courts "consider the totality of the circumstances that confronted the defendant at the time of questioning, and inquire whether a reasonable person would have felt that he or she was free to terminate the interview and leave." *United States v. Williams*, 760 F.3d 811, 814 (8th Cir. 2014).

Williams argues he was in custody and subject to interrogation when the officers questioned him about the shell casing and location of the gun. Once Sergeant Phillips saw the shell casing, she told Williams to be honest because it was obvious a gun had been fired and questioned him as to its location. Williams continued denying he had a firearm or that he shot it. Sergeant Phillips stated they would seek a warrant, and she left Apartment 32 to make a phone call. Upon Sergeant Phillip's reentry, Officer Arenas left, and Sergeant Phillips again explained their concerns and asked Williams if he would consent to a search of his apartment, which he denied. At that point, Officer Partida also left to begin the warrant process.

During that period, Williams's movement was physically unrestrained: he was not formally under arrest or in handcuffs. The officers were not blocking his exit, and he was in his own home, which is generally "not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985). The officers did not explain to Williams that he was not under arrest, but they did tell him he could relax, put his hands down, and could use his

10

phone to call his girlfriend. *See United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) (noting one factor courts consider to determine if a person is in custody for purposes of *Miranda* is "whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest"). As Williams sees it, he was subject to a "police dominated" atmosphere, noting he was outnumbered. But the officers' guns were not drawn during questioning, and at the time he made incriminating statements, only Sergeant Phillips was present.

Once Officer Partida left to begin the search-warrant process, only Sergeant Phillips and Williams were in Apartment 32. Conversation had stopped, and Williams was looking at his phone. After approximately forty seconds of silence, Williams stated, "Yep, I did fire the shot." Sergeant Phillips responded, "Okay," to which Williams followed up, "I'm not gonna lie to you, I did, I was sitting on the deck . . ." In addition, "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir. 1997). Under the totality of the circumstances, Williams was not in custody for purposes of *Miranda*, and the incriminating remarks were spontaneous.

Williams's statements to his girlfriend while waiting for transportation to the detention center should also not be suppressed. The Court finds no error with that recommendation made by the magistrate judge; Williams was undoubtedly in custody at that time, but those statements were not the result of police interrogation. *Id*.

### E. The Firearm

Williams next seeks to suppress the handgun found in his kitchen cabinets. The government argues exigent circumstances still existed to search for the gun, but even if they did not, Williams consented to the search. They also argue the gun would have been

11

inevitably discovered. Williams attempts to rebut the government's position on all grounds.

Williams's arguments against consent are unavailing. After Williams admitted to shooting the gun, Williams indicated the firearm was "behind him," and Sergeant Phillips asked, "Can you roll forward then so we can grab it?" Williams—whose back was to the kitchen and was blocking the entry to the kitchen—moved forward and said, "Yes." Williams argues his "affirmative response was an admission that he was physically able to roll forward and that he would." He argues he was merely showing Sergeant Phillips "that he 'can' do it, by doing it." But Williams's actions and subsequent statements about where the gun was hidden do not align with that assertion. He and Sergeant Phillips continued discussing the location of the gun. Williams did not ask Sergeant Phillips to stop searching for the gun; he continued giving her directions and clues as to where the gun was located. He eventually told her the gun was in the kitchen cabinets, and Sergeant Phillips located it.

Williams next argues that even if his response was some form of consent, it was not voluntary. Again examining the factors for voluntary consent, *see Golinveaux*, 611 F.3d at 959, the Court finds Williams did consent to the search for the gun. As discussed above, Williams was an adult and was on parole, and his admission of having shot the gun was spontaneous. Sergeant Phillips was the only officer in Apartment 32, and when she asked him if he could move so she could secure the gun, he affirmed with both words and actions. As Sergeant Phillips was searching the kitchen, Williams did not object to the search—he continued directing Sergeant Phillips to the gun's location.

The government also makes a strong argument that the firearm would have been found anyway and is admissible under the inevitable-discovery doctrine. "The inevitable discovery doctrine provides an exception to the exclusionary rule where 'the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Craddock*, 841 F.3d 756, 760 (8th Cir. 2016) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "For

that exception to apply the government must show (1) a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) an active pursuit of a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Allen*, 716 F.3d 382, 387 (8th Cir. 2013).

The government has established the officers had at least a reasonable probability of finding the gun given the shell casing on the balcony and his admission that he was the one that fired the gun. The second prong is a closer call. Williams argues the officers only "discussed" getting a warrant and were not actively pursuing one. Although the officers did not ultimately secure a warrant before finding the gun, Officer Partida initiated that process and did more than merely discuss it as a possibility. Had Sergeant Phillips not received consent to search for the firearm, she credibly testified they would have continued the process of obtaining a warrant. *See United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008) (explaining the pursuit of a warrant is a sufficient alternative line of investigation). Because the evidence here was enough to secure a search warrant and the officers took steps to get one, the second prong is also satisfied. *See*, *e.g.*, *United States v. Hammons*, 152 F.3d 1025, 1030 (8th Cir. 1998) (finding the second prong was satisfied when "the officer did not actually call the drug-canine unit before the misconduct occurred, but . . . if [the defendant] did not consent, the officer was prepared to walk back to his patrol car and radio the drug-canine unit"). The firearm is admissible.

### III. CONCLUSION

Under the totality of the circumstances in this case, the officers acted under an objectively reasonable belief that there were exigent circumstances to justify the initial entry and sweep of Williams's apartment, and Williams consented to the search. Williams also consented to the search for the gun and it would have been inevitably discovered. Finally, Williams's statements should not be suppressed under *Miranda*. Accordingly, Cornell Williams's Motion to Suppress (Filing No. 21) is denied.

IT IS SO ORDERED.

Dated this 14th day of October 2021.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge